May it please the court, Nora Ahmed for appellants. As to Mr. Stevenson's death, I want to focus on the final 17 shots fired by Broussard, Montgomery, Bud. Viewing the facts in the light most favorable to appellants, what we have before these shots are fired is the following. Mr. Stevenson is wounded. He's been shot in either the neck or the head. He's in a car that's immobilized, its rear tire having been flattened by gunfire. He's contained. The rear bumper of his car is jammed up against a police SUV to the back. There are bollard posts in front. An industrial-sized dumpster is to the right, and we have another SUV to the left. Firing at Mr. Stevenson in this condition violated clearly established law on February 23, 2016. In Mason v. Lafayette, a police officer fired seven shots at Mason. Qualified immunity was granted with respect to the first five shots, but there were disputed issues of material fact as to the final two shots. The police officer said that as Mason lay prone and face down, he attempted to reach for his weapon by moving his arm. His girlfriend, who was at the scene, stated that he simply lifted his head up and put it back down, and that the rest of his body did not move. The court indicated that, viewing the facts in the light most favorable to appellants, a police officer at the time that that officer shot would have appreciated that Mason was incapacitated. And that, Your Honors, is the situation that we have here. If we view the facts in the light most favorable to appellants, we understand that Mr. Stevenson has been shot by Henning's gunfire. Now, what we understand is Henning is the first officer to shoot, and in his LSP investigative interview, he told the inspector that after he fired, quote, there was some blood, maybe on Mr. Stevenson's neck or on his face. Now, we have to understand that Mr. Stevenson suffered from seven gunshot wounds. Five of those bullets were lodged in his body. We know that one went through the left side of his neck, and that bullet was retrieved near his right jaw. We know that another went through the left side of his head, near his ear canal, and that was retrieved near the upper right part of his brain. We also understand from the record that these two bullets are of unknown origin. So, viewing the facts in the light most favorable to appellants, a jury could conclude that Henning's gunshot struck Mr. Stevenson in either the neck or the head. Now, we have to ask, what did Broussard appreciate, what did Montgomery appreciate, and what did Budd appreciate? So, here's what Budd says. He knows that an officer has fired a weapon, and he's about seven feet from Mr. Stevenson at this point, and here's how he characterizes him, quote, he was pretty deep down in his seat. All I could see was his head, low, and he was kind of leaning to the passenger side. That's what it looked like to me, but all I could see is his head just above the driver's side door. So, a reasonable juror could consider these facts and state, well, Mr. Stevenson, his head, according to Broussard, appears in alignment with the wheel. His head is not in alignment with the windshield. And assuming that he has been shot on the left side of his face or his neck, Montgomery would have had an appreciation for that because he indicated that he was leaning to the passenger side. Now, the LSP investigator who came to the scene after Mr. Stevenson had passed, he said that he noted, quote, obvious signs of death, and he indicated that Mr. Stevenson was in a position that effectively matched Broussard's testimony. He said that Mr. Stevenson was, quote, leaning toward the passenger seat with his head tilted to the rear and facing upward. So, counsel, you're sort of slowing down what happened and we're looking at it in sort of micro segments. What does the evidence show about the time frame that we're talking about in real time? We're talking about one minute and 25 seconds. And sort of starting and stopping from what points? Well, we begin with Birdwell coming to the scene, seeing Mr. Stevenson, and then we end with the gunshots that end Mr. Stevenson. So, Birdwell coming and then the ending of the gunshots, that's a minute 25, you say? Correct. I guess what I meant was a little bit more specific, the shooting. What is the time frame of when shots were first fired and then ending when shots stopped being fired? So, Your Honor, that's a difficult question because we don't actually have video evidence and we don't have particular testimony as to how many seconds transpired. What we can look at when we're analyzing the situation is Birdwell comes, we know that Mr. Stevenson's car is not moving. He knocks on the window, ends up smashing it, right? We understand that the car then moves. Now, Henning arrives on the scene. There is distinct testimony about in which reversal Henning actually shoots. But we understand that Henning is the first to fire his weapon. And then, according to Henning… That was at the tire? No. So, Henning's shot is at Mr. Stevenson. Right? So, appreciating these facts, you know, in the light most favorable to appellants, we have Birdwell who arrives, window smashed. It would appear that the vehicle then reverses. As it moves forward, we have Henning who comes, fires at Mr. Stevenson. So, the disputed issue of material fact number one is whether that particular shot struck him in the neck or the head, thereby incapacitating him at that moment. Right? We understand that Mr. Stevenson then reverses into the police vehicle. Now, the second and third shots, those come from Broussard. And those are directed at the wheel. And it is after that, and there's still some question, right? So, Broussard is the only one that testifies that after he fires at the tires, that the car then moves forward again. No one else testifies to that. But, he testifies that it then moves, and then it's after that that we have 17 shots. Okay. So, that's helpful. So, you're zeroing in on when the 17 shots occur within this minute 25 period that begins with Birdwell. Okay. But, am I understanding correctly by your chronology that the car is moving after Broussard shoots at the tires? Well, we do not accept that, Your Honor, and I'll tell you why. Right? So, Broussard testifies that he, quote, flattened the tire. Right? So, this is what he says. He then does say after this, in his interview, that the car moves forward again. None of the other officers testify that the car, in fact, moves. What we understand from Montgomery is that he immediately hears the air coming out of the tire. Henning says that, too. Right after Broussard shoots, they hear the air coming out of the tire. And, we understand that before Montgomery shoots, right, as part of the final 17 shots, he testified to the condition of the car. He said the car was, quote, having trouble because it had hit the police vehicle so many times and the back tire was shot. So, I would say that there is a dispute as to whether, in fact, we know that the car moved forward again after Broussard shot at the tires. Let me ask it this way. So, obviously, you need some evidence, right, to create a material dispute of fact. So, I understand the police evidence that the car is moving forward, at least in some way, because it's obviously not found in the final condition resting up against the back SUV. So, at some point, it has to move forward in some way at some amount of speed. So, my question is, what would be your evidence that it wasn't moving? Does that make sense? Yeah. So, my evidence that it's not moving is basically what the officers on the scene said, right? So, we know that Montgomery says he heard the air coming out of the tire, and his characterization of the car is that it was having trouble because it had hit the police vehicle so many times and the back tire was shot. Right. So, if I'm understanding what you're saying, there can't be a dispute of material fact about whether the car was moving because we only have the officer's testimony. Is that fair? That is fair as to this particular moment as to whether the car moved forward after this particular shot. But we all understand that the car was effectively found in reverse by the LSP investigator. So, when we're talking about the back tire, we understand that it's been shot by Broussard. He says that it's flattened. We also understand that Montgomery says that he's heard the air coming out of the tire and that the car is having trouble because the back tire has been shot. One follow-up question on the shots. So, I understand that it's inconclusive about which bullet originated in which way and which one hit first or second or whichever. I'm a little confused, though, about the theory as to if the first bullet incapacitated him, what would be the injury? Suppose the first bullet was fatal. Would a second bullet violate qualified immunity? Your Honor, I would say yes, it would. And I think we can look back to 2008. So, this court's aware there's an unpublished case, I want to be clear, called Graves v. Zachary. And the court in that case had to assess what clearly established law was at the time. So, I'm only citing it so that it's instructive as to what the court decided then. And just in that case, so we're clear, a man is holding a gun, he's shot in the groin, and then he's shot in the chest. What we understand from the police officer is that, well, I shot him in the groin and then in the chest because he was still holding this weapon and I didn't see him slump over. So, what we have in that particular case, because the individual survived, was even though I was still holding the weapon, I was incapacitated. And that was a disputed issue of material fact that ended up going to the jury. So, I think here, we don't know whether this shot to the neck or the head killed Mr. Stevenson at that moment in time, or if it precipitated his death such that he was dying in the moment. And the only thing I wanted to say about what the court in Graves said is that they said that it's clearly established that an officer may not shoot again at someone who is downed or incapacitated. So, that's what I would look to, Your Honor, as to if somebody is already dead, does it violate qualified immunity to shoot at them again? Right. So, in Graves, obviously, there wasn't a dispute about the fatal shot. And same thing in Mason. So, obviously, all these facts are horrible. In Mason, there was no dispute that the officer's shots in the back were the ones that had killed the decedent. And so, those were the two that went to the jury. Since it's your burden to overcome qualified immunity at summary judgment, the thing I'm hung up on is how you can get over it, that is, the qualified immunity to defense, if you don't have anything other than maybe. Well, I think, Your Honor, what we know is that he's been viewing the facts in light most favorable to appellants, the shot in the neck or the head, such that a reasonable juror could infer that he was incapacitated. The extent of that incapacitation, that is unknown, right? But there is an appreciation for what that incapacitation could be. And then we need to look to whether Broussard appreciated that incapacitation. I was able to tell Your Honors what evidence we have in the record of that. And then we also have to look to what Montgomery appreciated about that interaction. So, before Montgomery ends up firing the 17 shots, he does describe Mr. Stevenson as incoherent. He says, I just saw him moving around, bouncing inside the vehicle, and saw his mouth possibly moving. I never heard him say anything. But we know is that… Freshman recollection, sorry to interrupt. By concentrating on the 17 shots, are you, is your argument, I don't know if this is in your brief, I just don't remember. Is your argument that the first shot by Henning, the Henning shot first, right? That Henning would be entitled to qualified immunity for that shot? Your Honor, I would like to rest on our papers and the clearly established law there and to focus on the 17 shots here. I'm just asking as a matter of fact, are you all claiming that the first shot by Henning is also actionable and he shouldn't get qualified? That should go to the jury also? We are saying that as well, yes. Let me ask you this. Do you dispute that the vehicle moved after he was shot through the neck? We do not dispute that it moved, but I think it's important to understand that someone does not instantaneously die once they're shot in the neck. And as Judge Duncan noted, we're talking about a series of events that happened relatively quickly. So it is possible that Mr. Stevenson and a juror could find, did in fact move the car in reverse after he had been shot. It was revved up and moved pretty fast. Well, there's a bit of dispute before the 17 shots, if your Honors will permit me, on the revving, right? Go ahead. So we have Bud, who's also the third officer here, who shot. And it's important for us to understand that he's the one who testifies that the car moves forward and that is the reason that he actually ends up firing. But that fact is disputed in the record. And Bud is the one, your Honor, who effectively said, could not confirm that the engine was revving, right? So he was asked that by the LSP investigator and he couldn't confirm the engine was revving. What we have in contrast to that is Masters, who did not shoot, who said that he knew that the vehicle was not moving forward because he knew it was in reverse. Because he saw this front wheel drive, the tires, spinning backwards. We know the LSP investigator finds the car in reverse. And we also understand that Bud, who's shooting, is shooting from the exact same vantage point as Birdwell, right? He in fact sort of moves him out of the way. Birdwell also has his gun drawn at this moment in time. But he does not shoot from this exact same vantage point because he did not perceive his life to be in danger at that time. Thank you, Counsel. You'll have some time for rebuttal. Okay. Thank you, your Honor. Ms. Johnston. Good morning. May it please the Court. Tara Johnston, First Sheriff Gautreaux, Lieutenant Birdwell, Detective Montgomery, Detective Broussard, Sergeant Bud, and Detective Henning. I just want to start with clarifying some of the things that have been said. Appellant is trying to create issues of fact that simply don't exist. I don't want the Court to be confused by the things that were said today or some of the things that are in the briefs. First, there is absolutely no evidence Henning shot made contact with Travis Stevenson. That's a new argument today. I wasn't expecting it. But there is absolutely no evidence in the record that it made contact with him. It doesn't matter. That doesn't create an issue of fact to preclude summary judgment at this point because Dekar continued going forward and backwards multiple times after Henning fired his shot. So the threat had not ended. The threat was still there. This Court had a ruling in April of this year. And using that to analyze whether or not the subject was incapacitated when the next round of shots were fired. In this case, there were 21 shots. It started with Henning firing one the first time that Dekar proceeded forward. Lieutenant Birdwell was directly in front of the car. He testified that he was directly in front of the car. Detective Henning testified that Birdwell was in front of the car. Lieutenant Birdwell actually testified that he, in that little space that he was in, had to jump into that parked SUV to avoid being hit by the vehicle Travis Stevenson was driving. Fortunately, he got out of harm's way and was able to prevent that contact. But Dekar continued going forward and backwards at a high rate of speed. Now, Lieutenant Birdwell was focused. His job that day, he testified several times. You know, we put ourselves in danger every day when we do our jobs if we have a duty. And my job that day was to take that guy into custody. He was the suspect of a felony domestic violence charge. And he had to take him into custody. Can't let him get out and hurt somebody else. So, he's still trying, he's focused on getting him out of the car. He thinks, oh, he's ran into the wall. I can get him out now. Then he reverses. Okay, I'm going to go get him now. It never stopped him. The second round of shots were the three that Detective Broussard fired towards the tires when he arrived, attempting to disable the vehicle. What appellants have said is that the tire flattened and the car was no longer able to move. There's no evidence of that. In fact, Detective Montgomery and Detective Broussard both said the car was able to move forward and backwards after that. So, that attempt to disable the vehicle was unsuccessful. The car was still able to move. The threat had not ended. And then the next round of shots were the remaining 17 shots fired by the three deputies that ultimately ended the threat. You can't break those down. They were fired simultaneously by three different deputies, and they ceased shooting when the threat had ended. I guess I probably phrased it poorly. My question about the time frame, and Ms. Ahmed helpfully said the entire time frame was 125. That's generous. Okay, let's assume that for purposes of argument. That's the entirety. The shooting, things happened, right? There was an approach to the car. There was a window being broken. There was one shot. There were shots to the tire. There was the car moving back and forth. And then at some point, the 17 shots. And what I was wondering about was, you know, what you said, they're simultaneous. And I'm just wondering, what's the time frame? Is it 5 seconds? Is it 10 seconds? Maybe the evidence doesn't conclusively show, but we ought to be able to get an idea. Again, it's kind of hard to know the exact seconds, right? But you can tell from the dispatch recordings, which were within attachment 15, that the court has an evidence that when they radioed to dispatch and said, he's rammed one of our units. At this point, he's just reversed into Burwells Tahoe. Quite violently enough that the airbags were deployed, and it pushed that Tahoe 3.4 feet into another parked car. But from that point to the time they said, send the CMS suspects down, it's 37 seconds. Breaking it down even further, from the time that dispatch radio, that hinting radio to dispatch that shots were fired when he fired his shot, it was only 18 seconds from that shot to the third round of shots. So the threat's continuing, but it's happening really quickly.  When it's broken down with six different deputies, the perspective of six different deputies who arrived at different times and were standing in different locations, if you break down the deposition testimony, it seems like an extremely long time, but in reality, from the time that the situation escalated to the time the suspect was down, it's 37 seconds. It's really quick. And again, from the time that the first shot was fired and the last round of shots was fired, it's only 18 seconds. So they are simultaneously. But again, after hinting shot, the threat continued. He's still going forward and backwards to the area where a deputy was standing. What's the entire, what's the area? How much, how large an area is it? Okay, so I provided a little diagram from the evidence to y'all just because I thought a visual aid may help here. But it's a small area. Even the path that the vehicle, according to the state police diagram, this is an independent law enforcement agency that prepares this evidence, and it cannot be disputed. It's just a little over 15 feet total, and Birdwell's about in the middle of it. So let's say at the time that the car was where Birdwell approached at the driver's door, there's only 3.9 feet between Stevenson's car and the parked SUV. And Birdwell continues to try to approach him and has unintentionally placed himself in front of this vehicle. One of the things that the appellants have argued is that Birdwell's actions led to this. Whether it was from the beginning of the way he approached the suspect, this court has not recognized a state-created need theory. The fact that he could have or should have approached it differently is irrelevant here. It only matters at the moment of the threat. The shooting was at the moment of the threat. It doesn't matter what happened before that. But right here, you know, it's a very short, very small space. Birdwell did not know that he had a place to escape. He testified. I had no idea where to go. I was focused on... My question about the space was you said that the car was able to reverse at a high enough speed to make the airbags and the cruiser deploy. Yeah. I don't know what speed that was. Well, I don't think that we know. But, I mean, he really only backed up less than 15 feet and was able to go. It wasn't parallel parking speed. Correct. He was definitely, I mean... And the testimony is that when he went forward, he went at... Broussard and Montgomery both state that when he went forward and hit that pole in front of the staircase of the building, it, like, actually rode up the pole a little bit. So he hit it going forward at a significant pace. Sergeant Budd stated to the state police that, you know, he only saw the vehicle go forward once and back once. But the time he saw the vehicle go forward, it was at such a high rate of speed that if he had come forward another time at that rate of speed, he and Birdwell weren't making it out on the other side. He believed he would be killed if that vehicle was able to come forward. And going back to whether or not at the time those shots were fired by Budd and Broussard and Montgomery at Stevenson, was he incapacitated? Again, it's just an argument to try to create an issue of fact that isn't there. There's no evidence that he was incapacitated. Any blood that might have been there could have been there prior to the officer's arrival. It could have been because Birdwell broke the window and maybe he got cut a little bit. But it had not stopped the threat. The threat was still there. The car was still moving. And at the time those shots were fired, the deputies all stated there's no evidence that Budd said he couldn't see his hand. He said that he saw his hand on the steering wheel. He's in control of the vehicle. He's in control of his deadly weapon. And they saw Budd and Montgomery all saw him moving his right hand, whether he's... What was he doing? They couldn't say for sure. The engines racing, Budd, Montgomery, Broussard, Masters, they all heard the engine racing. So it's safe to assume under all of these circumstances, you have to consider the entirety of the circumstance, it's reasonable to believe that car's coming forward again. You see the hand moving as he's shifting. You hear the engine racing. So he's not incapacitated at this point. And it's reasonable to think he's about to come forward. This court, in these types of cases with excessive force or deadly force used at a vehicle, has analyzed there's two central issues, two central factors to discuss, whether the time and the space, so the temporal and proximity. We're talking Burwell is at most eight feet away from the front of the vehicle. Eight feet. He testified in the left front of the vehicle. According to this diagram, based on all the officer's testimony and the evidence that the state police reviewed, he's at most eight feet in front of this car. And we've already talked about that the evidence and the testimony is how fast that car was accelerating forward, gunning it, flooring it, doing the best. But one of the detectives said, pegging out, never heard that term before. But it apparently, you know, was an excessive rate of speed to him. He doesn't have the time or the space to move out of the way. And so those factors that this court has considered in cases like this, when you look at those and looking at this diagram to see where he was at the time, there's not much space. There's not a lot of time to react to something that's happening so quickly. And like you said, 37 seconds from the time he first hit the car to the fatal shot. It's fast. There never was any indication that Watson had a gun or any other kind of deadly weapon other than the car, right? There is no evidence of that. Lieutenant Birdwell testified that when he approached the vehicle, the windows were fogged up and he couldn't see in it. One of the other detectives, I believe it was Henning, was depending on his girlfriend and her daughter. Black object could be anything. Reasonable, our expert Joseph Stein testified that in these domestic violence cases, it's very usual for the suspect to arm himself and use it either against law enforcement officers or somebody else, probably the partner. And so it's reasonable to think that he had access to a weapon. I don't know if anyone ever saw when nobody ever testified that he had a weapon, but obviously this court has considered a vehicle to be a deadly weapon. And that's what they believed here. My position is that breaking them down, when you look at the factors for qualified immunity, Henning didn't cause an injury to Mr. Stevenson. So therefore, he's entitled to qualified immunity because you can't reach that factor. Just because the plaintiffs are arguing, or the appellants are arguing that Henning's shot hit Mr. Stevenson, there's no evidence of that. The state police did a very thorough investigation, as you can see from the amount of evidence that was attached to, in this case, there's no evidence that Henning shot him. And to keep going, Masters and Birdwell never fired. Not because they didn't think there was a risk, not because they didn't think that Birdwell himself was in danger. Masters testified he did think that Lieutenant Birdwell was about to be run over, testified about to be run over, but he could not fire a shot because Montgomery was in his way. He would have. So when you talk about the perspective of the deputies on the scene, you have six deputies on the scene, all of whom thought Lieutenant Birdwell was in a perilous position to be run over by that accelerating vehicle. Only four shot, but all six of them thought he was in a position to be killed or receive serious bodily injury. The detective, multiple detectives, but the lead detective who investigated this case from an independent law enforcement agency also believed all the deputies acted reasonably on the scene. So taking this from the perspective of an officer, a reasonably prudent officer on the scene, everybody that was at the scene and everybody that investigated it thought it was reasonable. It stands to reason that maybe it actually was reasonable. Again, this is a rapidly evolving situation with an unfortunate circumstance, except for the deputies. A lot of times the deputies don't survive a case like this, and in this case they did. Appellants have not identified a controlling precedent rendering it beyond debate that any such reasonable officer would know in a split second that their actions violated the Fourth Amendment. Thank you. Just to clear up a thing, Appellant also made a comment about the reversal. Which time did Henning shoot? I think that the issue of fact that she was attempting to create is from Birdwell's testimony. Birdwell gave a statement to state police that night, hours after this incident, and said that Henning shot the first time the car went forward after reversing into his unit. Multiple years later, four years later or so, when he's deposed, he didn't remember which time it was. Obviously, you would rely on his statement right after the incident.  That's the only issue of fact as to which time that he went forward that Henning shoot. He said his statement would be more reliable on the night of the incident. Just touching on qualified immunity, I mean on official capacity because that was also an issue before the court. If this court finds that there was no Fourth Amendment violation, then obviously there's no official capacity, no Monell claim against the sheriff. I don't even know that that issue would be properly before the court because the plaintiff's appellate did not raise that until in response to the motion for summary judgment as far as this issue on the mentally ill, if that even really matters before the court. For a failure to train claim, the plaintiff's must show the training or procedure, training policy or procedure was inadequate, that the adequate training policy would allow the deputies to shoot Stevenson and the deliberate indifference of the sheriff. There's just no evidence that the sheriff was deliberately indifferent in training these guys on any aspect, but particularly on handling mentally ill individuals on the street. This case involves a single isolated incident of lack of training, alleged lack of training, but that's not sufficient to establish deliberate indifference. If we were to look at the court as recently as April has said the single incident exception is generally reserved for those cases in which the government actor was provided no training whatsoever. It's clear from the evidence the officers were trained that they had at minimum the training that was required by the state, but also training in addition to that. There's no evidence Sheriff Gautreaux had noticed that a shooting such as this was a highly predictable consequence of the training provided, so the court, the district court correctly dismissed the official capacity claims as well. Just going because I know that I didn't brief this case because it was an April case and the appellants prepared a Rule 28 letter to the court citing the Rope v. Horrible ruling on April 1st by this court suggesting whether the reasonable officer would have known that a subject was incapacitated after the first shot and contend the district court did not analyze the objective reasonableness of each shot fired. We've gone through those shots, you know, Henning shot, threat didn't stop in this case. Bruchard shot at the tires, threat didn't stop, car continued going forward and backwards, and then the remainder of the shots were all three deputies firing simultaneously, each of whom stated that they fired until the threat ceased and this court reasoned in Marlborough that, quote, it stands to reason that if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended. The case would be different if the officers had initiated a second round of shots after the initial round had clearly incapacitated the suspect and ended any threat of continued flight or if the suspect had clearly given himself up. And I think I've discussed this thoroughly, but in each round of the shots, the threat had not ceased until that last round and they ceased firing at the time the threat ended. There are no genuine issues of material fact to merit the reversal of the district court's grant of summary judgment. The district court properly determined no reasonable jury could conclude deputies did not reasonably believe Stevenson posed an immediate threat to Lieutenant Birdwell and therefore they are entitled to qualified immunity and respectfully request this court affirm the district court's granting of the motion for summary judgment. Thank you, counsel. Ms. Ahmed, rebuttal. Your Honor, I would like to clarify what our disputed issues of material fact are viewing the facts in the light most favorable to appellants. So we would posit that it's a disputed issue of material fact as to whether Henning shot incapacitated Mr. Stevenson such that the officers who ended up firing the 17 shots could have an appreciation for the condition he was in. Where would I look in the record for a genuine dispute of fact on that? Yes, Your Honor. So for Henning's testimony as to the blood on Mr. Stevenson's neck and face, that would be at his video interview at the 11th hour and the second minute and 29 seconds. As to the evidence of the seven gunshots to his body and the five bullets lodged therein in the neck and the headshot, that's going to be Record on Appeal 626 through 627. That's the L.S.P. report. As to Broussard's testimony as to his appreciation for Mr. Stevenson's condition, that would be at his L.S.P. video interview at hour 15 and minute 44. And as to the L.S.P. investigator's appreciation for the state that Mr. Stevenson was in when he found him, that's going to be at the L.S.P. report Record on Appeal 619. For Montgomery's appreciation of Mr. Stevenson's condition and the fact that he was inaudibly bouncing, that would be at video hour 12, minute 23. And, Counsel, where in your brief would I find your reliance on Graves and Mason for the distinction between the first four shots and the last 17? So, Your Honors, we did submit a 28-J letter on Roe v. Harvell, understanding that that is not the law that we're relying on. But a panel of this court did rely on Mason and Graves in that opinion to provide an appreciation for what happened in that incident. So I'm looking at the brief, though, that you filed. Correct. And it's not there. It's not there. It's reliance on the 28-J and that opinion where the court. And I'm looking here also at your description of Marlborough, which is sort of a related kind of idea about incapacitation. And I don't see any distinction between the first four shots and the last 17. Well, Your Honor, I think that was raised in part in footnote 6 of our reply brief as in the opposition brief opposing counsel said there's no evidence that Mr. Stevenson was wounded. And so in footnote 6, we ended up saying, in fact, that's not true. And we provided the citation to Henning's testimony, which I just talked to the court about. And then I thought it would be helpful for this court to talk about it during an oral argument. Well, obviously, we can't consider arguments raised for the first time in a reply brief anyway, certainly not in the footnote of a reply brief. And I wouldn't say it's the first time we're raising it, Your Honor. I think this is what they raised in opposition. And so it was important for us to clarify that Mr. Stevenson had, in fact, been wounded. So had that not been raised in the opposition, then I think there would be a question as to whether that's something we can talk about today. But because they are relying on that as a reason for there being no disputed issues of material fact, we think it's important for the court to take that into consideration. So as to the arguments that are actually in the blue brief, which would cover all 21 shots, what is your view of what the Fourth Amendment would have allowed the officers to do in this situation? Because I understand the argument that you've raised on appeal is that no shots are permitted by the Fourth Amendment. Every single one of the 21 is excessive force. So what would have been the thing they could have done when you've got Officer Birdwell, according to this diagram, somewhere between 6 inches and 12 inches from the left side of the car? I think Birdwell's location is in dispute after the first shot. Right? And I'm talking about just before the first shot. So when you're talking about before the first shot, Birdwell is there. He does not know that Henning has come. And we understand that Henning fires and that effectively almost raises Birdwell or is so close to him when he's near the vehicle. But it is after that, Your Honors, which is why I think it's important for us to understand the series of shots. Right? The first shot by Henning, the two to three shots to the tire, and then the 17th shot. Yes, but Judge Oldham asked what the officers are allowed to do outside of the Fourth Amendment. Right. So the officers are, in this particular case, Your Honor, we would say that Lieutenant Birdwell's life was not in danger based upon his own testimony. I understand. And I have a very specific question and I would be grateful for an answer. What should he have done, he, Birdwell, or any of the other officers consistent with the Fourth Amendment? Is the answer nothing? No, I think the answer, Your Honor, is what our expert testified to is it would have been to step back and allow Mr. Stevenson to finish the episode and then they could have acted. And that's where, you know, Lloyd Grafton has 50 years of experience, 23 years in the criminal justice university system. That was his recommendation. And if I could just on this training point, Your Honor, so there is a disputed issue   Thank you very much. Okay. Case is submitted. Thank you for well informed testimony. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.